UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

    v.

Jose Rodriguez-Garcia

Criminal No. 24-cr-072-LM-AJ
Opinion No. 2025 DNH 077 P

# **O R D E R**

The government charged defendant Jose Rodriguez-Garcia with two child pornography offenses following the warrantless search of a flash drive found in Rodriguez-Garcia's possession after he was apprehended upon suspicion of illegally crossing the United States-Canada border. Rodriguez-Garcia moves to suppress the fruits of that warrantless search. Doc. no. 16. The government objects, contending that the search was lawful under the border search exception to the warrant requirement. Doc. no. 19. The court held an evidentiary hearing on June 3, 2025.[1] For the following reasons, Rodriguez-Garcia's motion (doc. no. 16) is denied.

## BACKGROUND[2]

In the morning of June 6, 2024, Customs and Border Patrol ("CBP") Agent Blake Thilkey was driving to work on Hall Stream Road. Hall Stream Road is a two-lane, north-south road that is just east of and parallel to Hall Stream, a stream

---

[1] The presentation of evidence concluded on June 3. The court heard oral argument regarding the motion on June 5.

[2] The following facts are drawn from the parties' pleadings and the evidence adduced at the evidentiary hearing.

which, at points, marks the border between the United States and Canada. At certain points, Hall Stream Road is mere feet from the border. Hall Stream Road runs from Pittsburg, New Hampshire in the north, to Beecher Falls, Vermont in the south, where it connects with Route 253.[3] It is a very rural area. Only a small portion of the road is paved (the portion at the southernmost end). There are few full-time residences, no businesses, and sparse cellular service. Agent Thilkey, who has lived on the New Hampshire side of Hall Stream Road for six years and who drives on that road as part of his daily commute, described it as a "typical back country dirt road."

Agent Thilkey was scheduled to work at 6:00 a.m. on June 6, 2024. As he was traveling to work while still on the unpaved portion of the road, Agent Thilkey noticed two sets of bicycle tracks. The tracks caught his attention; it was rare for Agent Thilkey to see bicycles on Hall Stream Road. Agent Thilkey continued driving south for several miles. Around 5:45 a.m., he reached the Vermont-New Hampshire state line, where he came across two men on bicycles who appeared to be of Hispanic descent. One of the men was later identified as Rodriguez-Garcia. The men were stopped on their bikes but they appeared to be traveling southbound, toward Route 253. Their clothing was wet. They had identical gear: military style backpacks with bedrolls underneath, as well as helmets with headlamps. Agent

---

[3] Technically, Hall Stream Road terminates in the south at River Road, a road which allows travelers to proceed west to eventually reach Route 253. The agents testified that they referred to the road that Hall Stream Road connects with in the south as Route 253. For consistency, this order does the same.

2

Thilkey testified that persons who illegally cross the border often purchase their supplies from the same store at the same time, and therefore have the same gear. Suspicious that the men may have illegally crossed the border via Hall Stream, Agent Thilkey called his supervisor, Agent Benjamin Young, to relay his observations.[4]

Agent Young communicated Agent Thilkey's observations over CBP radio. Shortly thereafter, Agent William Mihalik responded that he had observed the two men Agent Thilkey described while traveling on Route 253. Agent Young drove to Agent Mihalik's location and the agents stopped the men, who were on a snowmobile trail that ran right alongside Route 253. Their clothing and shoes were soaking wet, and they had the same matching gear that Agent Thilkey had previously observed. Agent Young asked the men in Spanish about their citizenship status, and both said they were Mexican citizens. He also asked whether the men had just crossed the river into the United States, and Rodriguez-Garcia said that they had. In addition, Rodriguez-Garcia's bike had a cell phone mounted on it, which was displaying a GPS application. Agent Young testified that he saw a marker on the map right on Hall Stream at the United States-Canada border.[5]

---

[4] Agent Thilkey was not in uniform when he saw the men and he was driving his personal, unmarked vehicle.

[5] Agent Young further testified that he was able to make this observation simply by viewing the phone, i.e., without having to touch or manipulate the phone in any way.

3

The agents arrested both men for unlawful entry in violation of 8 U.S.C. § 1325 and transported them to CBP's nearby station in Canaan, Vermont for processing and the initiation of removal proceedings.[6] Rodriguez-Garcia said during processing that he crossed the river around 5:00 a.m. He also showed one of the agents where he crossed the border via Hall Stream.

After waiving his <u>Miranda</u> rights, Rodriguez-Garcia agreed to speak with Agent John Marquissee. As of June 2024, Agent Marquissee's responsibilities included interviewing persons illegally entering the country to determine whether they had worked with a human smuggling organization to facilitate their border crossing. Rodriguez-Garcia said that he first came to Canada in 2022 as a tourist but stayed in the country and worked in various factories, most recently living in Quebec. After deciding about a month earlier to come to the United States for work opportunities, Rodriguez-Garcia used Google Maps to research where he should enter the country. He said he decided to cross Hall Stream because it was not very big and it was close to the road. Rodriguez-Garcia said he decided to cross in New Hampshire because he had heard there were a lot of unlawful crossings in Vermont and there was less border control in New Hampshire. He said that, after crossing in New Hampshire, he planned to ride his bike to Montpelier, Vermont, where he would catch a bus to New York City.

---

[6] Agent Young testified that, as of June 2024, they were not criminally prosecuting misdemeanor violations of § 1325.

Rodriguez-Garcia described the layout of his crossing point, explaining that he went down a muddy hill on the Canadian side before crossing the river, which came up to below his waist. When he got to the United States side of the river, he said he went up a hill with a lot of gravel before reaching the road. Rodrigeuz-Garcia said that he planned the trip himself, though he did tell his family and his partner about his plans. He said he bought the bike at Canadian Tire and that he bought the backpack and all of its contents before the trip.

At the time of his arrest, Rodriguez-Garcia had a backpack and a fanny pack, both of which were wet. Agent Thilkey searched Rodriguez-Garcia's bags while Agent Marquissee conducted the interview. Agent Thilkey found a red container inside the fanny pack. Inside of that container were several electronic devices, including a thumb drive. Agent Thilkey brought the devices to Agent Marquissee. After the interview concluded, Agent Marquissee connected the thumb drive to a computer and began reviewing its contents. He testified that he was looking for evidence regarding Rodriguez-Garcia's illegal crossing, including evidence as to whether Rodriguez-Garcia had been working with smugglers. The first folder he clicked on contained files with file names suggestive of messages on the messaging application "WhatsApp," which Agent Marquissee testified smugglers frequently use because its messages are encrypted.

Agent Marquissee clicked on a file that he thought was a WhatsApp message, and a video began playing. He immediately recognized that the video contained

child sexual abuse material ("CSAM"). He opened a second file from the same folder, which also launched a video containing CSAM.

After discovering these videos, Agent Marquissee stopped his search and contacted Homeland Security Investigations ("HSI"). HSI agents later arrived at the station and reviewed the videos, which they found to constitute CSAM. Ultimately, HSI agents applied for a search warrant for all of the electronic devices seized from Rodriguez-Garcia. The affidavit offered in support of the search warrant application included the previous agents' descriptions of the videos containing CSAM. According to the government's objection, execution of the search warrant ultimately revealed ninety-one images and eighty-eight videos originating from known series of CSAM.

## DISCUSSION

Rodriguez-Garcia contends that the warrantless searches of his thumb drive do not fall into any exception to the warrant requirement; therefore, any evidence derived from those searches—including from searches conducted pursuant to the search warrant that was issued in reliance upon information obtained as a result of those assertedly illegal searches—constitutes fruit of the poisonous tree and must be suppressed. The government objects, contending that any warrantless search of the thumb drive was lawful pursuant to the border search exception.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches and seizures are presumed unreasonable. United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011). "In the absence of a

warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." Alasaad v. Mayorkas, 988 F.3d 8, 16 (1st Cir. 2021) (quoting Riley v. California, 573 U.S. 373, 382 (2014)).

The border search exception is one such exception. Id. It is "grounded in the government's 'inherent authority to protect, and a paramount interest in protecting, its territorial integrity.'" Id. (quoting United States v. Flores-Montano, 541 U.S. 149, 153 (2004)). "Further, 'the expectation of privacy is less at the border than in the interior and the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border.'" Id. at 16-17 (brackets and ellipsis omitted) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 539-40 (1985)).

Border searches may be conducted at (1) the physical border, (2) the "functional equivalent" of the border, or (3) the "extended" border. United States v. Perez Rivera, 247 F. Supp. 2d 108, 114 (D.P.R. 2003). "The functional equivalent of the border is 'the first point at which an entrant may practically be detained,'" such as an international airport for a person arriving on an international flight, a harbor for cargo shipped on an international vessel, or a post office for mail or packages sent from another country. United States v. Thomas, 257 F. Supp. 2d 494, 497 (D.P.R. 2003) (quoting United States v. Cardenas, 9 F.3d 1139, 1147 (5th Cir. 1993)). Officers may conduct so-called "routine" searches at the physical border or its functional equivalent without a warrant, probable cause, or even reasonable

7

suspicion.[7] United States v. Molina-Gómez, 781 F.3d 13, 19 (1st Cir. 2015). Such searches "are reasonable simply by virtue of the fact that they occur at the border." Flores-Montano, 541 U.S. at 152-53 (quoting United States v. Ramsey, 431 U.S. 606, 616 (1977)).

By contrast, the extended border search doctrine allows for searches at a "greater spatial and temporal distance from the border" than searches at the physical border or its functional equivalent.[8] Perez Rivera, 247 F. Supp. 2d at 115. However, because such searches do not take place at the border or its functional equivalent—where "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith," Flores-Montano, 541 U.S. at 152, and where individuals have reduced expectations of privacy, Montoya de Hernandez, 473 U.S. at 539—extended border searches are subject to more stringent requirements. Perez Rivera, 247 F. Supp. 2d at 114-15; see also United States v. Stewart, 729 F.3d 517, 525 (6th Cir. 2013) (noting that "extended border searches

---

[7] "Non-routine searches, by contrast, require reasonable suspicion." United States v. Molina-Gómez, 781 F.3d 13, 19 (1st Cir. 2015). While "there is no hard-and-fast rule" for determining whether a search qualifies as routine or non-routine, the "degree of invasiveness or intrusiveness associated with" the search is generally what courts look to. Id. (quoting United States v. Braks, 842 F.2d 509, 511-12 (1st Cir. 1988)). Few searches qualify as non-routine. See Alasaad, 988 F.3d at 18 ("[S]trip searches or body-cavity searches are examples of non-routine searches.").

[8] Rodriguez-Garcia notes that the First Circuit has not yet adopted the extended border search doctrine. However, it appears that every other circuit asked to recognize the doctrine has done so, see United States v. Stewart, 729 F.3d 517, 524-25 (6th Cir. 2013) (collecting cases), as has every district court within the First Circuit. There is no reason to think the First Circuit would reject the extended border search doctrine.

'occur after the actual entry has been effected and intrude more on an individual's normal expectation of privacy'" (quoting United States v. Alfonso, 759 F.2d 728, 734 (9th Cir. 1985))); United States v. Cotterman, 709 F.3d 952, 961 (9th Cir. 2013) (en banc) ("The key feature of an extended border search is that an individual can be assumed to have cleared the border and thus regained an expectation of privacy in accompanying belongings.").

Whether deemed routine or non-routine, a search is permissible under the extended border search doctrine if: (1) there is reasonable certainty that the person or thing to be searched crossed the border; (2) there is reasonable certainty that nothing of significance has changed about the person or thing to be searched since the border crossing; and (3) there is reasonable suspicion that the person or thing to be searched was involved in criminal activity. Perez Rivera, 247 F. Supp. 2d at 115. The court will consider each factor in turn.

I.   There is Reasonable Certainty that a Border Crossing Occurred

"Reasonable certainty, in this context, has been defined as a standard which requires more than probable cause, but less than proof beyond a reasonable doubt." Id. In this case, CBP agents first observed Rodriguez-Garcia on Hall Stream Road close to the United States-Canada border. Rodriguez-Garcia admitted to having crossed the border via Hall Stream about forty-five minutes before Agent Thilkey first saw him on Hall Stream Road. When Agents Young and Mihalik stopped him just off Route 253 about fifteen minutes later, his clothes, shoes, and bags were wet. He later confirmed at the station that he had crossed the border illegally, detailed

his preparation for making the border crossing, explained why he selected the crossing location that he did, and described the layout of the area where he crossed.

Rodriguez-Garcia contends that this factor is not satisfied because "there is no direct evidence that [he] crossed the border." Doc. no. 16 at 11. In other words, no one saw him cross the border. The court is unpersuaded. "[A]n agent or officer need not have observed the crossing." United States v. Guzman-Padilla, 573 F.3d 865, 879 (9th Cir. 2009). Rodriguez-Garcia admitted to illegally crossing the border approximately forty-five minutes before agents first saw him directly adjacent to the border. While Rodriguez-Garcia discounts his admissions, claiming they are uncorroborated, he is incorrect. His admissions are corroborated by, among other things, (1) the markers on his phone, (2) his wet clothing, (3) his description of his plans to make the crossing, (4) his description of the layout of the crossing, and (5) his description of what he planned to do after crossing.

II. There is Reasonable Certainty That the Thumb Drive Crossed the Border and That Its Contents Did Not Change From the Time of the Crossing

Officers found the thumb drive inside a fanny pack that was on Rodriguez-Garcia's person at the time CBP agents arrested him. The fanny pack was wet, along with Rodriguez-Garcia's clothing, shoes, and other bag. Rodriguez stated that he purchased his supplies before the trip and that he wasn't receiving assistance from anyone else. He did not claim that anyone else had placed anything in the fanny pack or that he had obtained anything after he crossed the border. Moreover, given the time of day (between 5:00 and 6:00 a.m.) and the rural location of the crossing and apprehension, it is implausible that Rodrgieuz-Garcia could have

10

acquired the thumb drive between when he crossed the river and when CBP agents detained him. Finally, because Rodriguez-Garcia did not have a computer in his possession, he would not have been able to access the thumb drive to modify its contents between when he crossed the river and when he was apprehended. For these reasons, there is reasonable certainty that the thumb drive crossed the border and that its contents did not change from the time of the crossing.

Rodriguez-Garcia claims that this factor is not satisfied because he was not under CBP's continuous surveillance from the time of the crossing to the time he was apprehended. Because CBP did not detain him until an hour after the crossing and did not have him in their sights during that time, he claims the government cannot rule out the possibility that he could have obtained supplies from an accomplice after he crossed the border—supplies like a thumb drive containing travel documents.

It is true that, in evaluating whether it is reasonably certain that the object to be searched crossed the border and that no change in its contents occurred from the time of the crossing, courts have emphasized the importance of continuous surveillance from the time of the crossing to the time of the search. E.g., United States v. Bilir, 592 F.2d 735, 741 (4th Cir. 1979). But "surveillance . . . is important only insofar as it establishes an absence of changed conditions." 5 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 10.5(g) (6th ed.). "Breaks in surveillance are permitted . . . when other circumstances establish with reasonable certainty that the goods discovered upon search of the suspect or his

11

vehicle were goods under his control when he entered the country." Id. (quoting United States v. Anderson, 509 F.2d 724, 726 (9th Cir. 1974)); accord United States v. Moore, 638 F.2d 1171, 1173 (9th Cir. 1980) (extended border search of vehicle requires "continuous surveillance of a vehicle . . . or similar information that establishes to a reasonable certainty that it crossed the border and that any contraband found was aboard when the border was crossed"). Simply stated, "[c]ontinuous surveillance is not a requirement of an extended border search." United States v. Driscoll, 632 F.2d 737, 739 (9th Cir. 1980); accord Cardenas, 9 F.3d at 1150 (same); United States v. McGinnis, 247 F. App'x 589, 596 (6th Cir. 2007) (same). Rather, "the extended border search doctrine looks at factors such as time, distance, and continuous surveillance to establish to a reasonable certainty that the contraband found was not acquired after crossing the border or entering the United States." Perez Rivera, 247 F. Supp. 2d at 115. Here, as discussed above, there is significant evidence that Rodriguez-Garcia had the thumb drive at the time he crossed the border, that he did not acquire it after the crossing, and that he could not have accessed the thumb drive between crossing the border and encountering CBP.

     Moreover, while Rodriguez-Garcia argues that the government cannot rule out the possibility he acquired the thumb drive from an accomplice in the U.S. after crossing the border, he ignores his statement to Agent Marquissee that he planned the crossing himself without help from others. "Reasonable certainty 'is a higher standard than that of probable cause, but it does not require knowledge beyond a

12

reasonable doubt.'" Guzman-Padilla, 573 F.3d at 880 (brackets omitted) (quoting United States v. Corral-Villavicencio, 753 F.2d 785, 788 (9th Cir. 1985)). "Rather, 'the totality of the facts and circumstances within the officers' knowledge and of which they have reasonably trustworthy information must be sufficient in the light of their experience to warrant a firm belief'" that the object crossed the border and that its condition had not materially changed since the crossing. Id. (brackets and emphases omitted) (quoting United States v. Tilton, 534 F.2d 1363, 1366-67 (9th Cir. 1976)). While Rodriguez-Garcia is right that the government cannot rule out the possibility he acquired the thumb drive after the crossing, "[t]he government is not required to negate every hypothetical possibility as to how the contraband may have been obtained subsequent to the border crossing." Cardenas, 9 F.3d at 1152 (quoting United States v. Ramos, 645 F.2d 318, 321 (5th Cir. 1981)). Given the significant evidence that Rodriguez-Garcia crossed the border with the thumb drive and that its contents did not change after the crossing, "the mere assertion by the defendant that there was the opportunity to obtain the [thumb drive] after the border crossing is insufficient to controvert the facts established by the government." Id. (emphasis omitted) (quoting Ramos, 645 F.2d at 321).

III.  There Was Reasonable Suspicion At the Time of the Search that the Thumb Drive Was Involved in the Criminal Activity of Improper Entry

To conduct an extended border search, there must be "reasonable suspicion that the subject of the search was involved in criminal activity." Perez Rivera, 247 F. Supp. 2d at 115 (quotation omitted). The officer's suspicion must have "a particularized and objective basis." Id. at 116. To be particularized, the officer's

13

suspicion "must be 'grounded in specific and articulable facts.'" United States v. Pontoo, 666 F.3d 20, 28 (1st Cir. 2011) (quoting United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007)). "The objectivity requirement dictates a focus on what a reasonable law enforcement officer in the same or similar circumstances would have thought." Id. The court looks to the totality of the circumstances, and "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Perez Rivera, 247 F. Supp. 2d at 116. Finally, "the reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior." Id.

The searches were supported by reasonable suspicion. At the time of the thumb drive's search, Rodriguez-Garcia had been arrested for improper entry in violation of 8 U.S.C. § 1325. He had confessed to crossing the border via Hall Stream. His clothes and backpack were wet, indicating he had them on him at the time of the crossing. Officers had a particularized and objective basis for believing that the thumb drive was involved in the criminal activity of improper entry.

Rodriguez-Garcia argues that the search was nevertheless unlawful because, according to him, the Supreme Court's opinion in Riley v. California requires that officers obtain a warrant before searching electronic devices. But the First Circuit has expressly rejected the argument that Riley, which addressed searches incident to arrest, extends to border searches. See Alasaad, 988 F.3d at 17 ("Riley does not command a warrant requirement for border searches of electronic devices nor does

14

the logic behind Riley compel us to impose one."). Indeed, the First Circuit "h[e]ld that neither a warrant nor probable cause is required for a border search of electronic devices." Id. at 18. Rodriguez-Garcia's argument is therefore unavailing.[9]

Undeterred, Rodriguez-Garcia contends that probable cause to arrest for unlawful entry cannot suffice to justify the warrantless search of an electronic device on the arrestee's person because then "Border Patrol would be able to search the electronic devices of every person stopped by a roving border patrol near the border and arrested for illegal entry or illegal reentry, and 'extended border search' cases with that fact pattern would be abundant." Doc. no. 16 at 14-15. Rodriguez-Garcia contends that there is a paucity of such caselaw, claiming that he has identified only one factually similar case to his—United States v. Manrique-Frias, 692 F. Supp. 3d 1036 (D. Mont. 2023)—and that the district court in that case struck down the warrantless search of a cell phone.

This argument conflates the search incident to arrest exception with the border search exception. Rodriguez-Garcia is correct that, under Riley, arresting a person for improper entry (or any other criminal offense) on the basis of probable cause to believe the person committed that offense does not justify a search incident to arrest of the arrestee's cell phone. For example, if authorities gain information

---

[9] Rodriguez-Garcia states in his motion that he raises this issue for preservation purposes only. Doc. no. 16 at 15. He notes that two district courts in the Second Circuit have disagreed with Alasaad's reasoning since the time it was issued. See United States v. Smith, 673 F. Supp. 3d 381, 394 (S.D.N.Y. 2023); United States v. Sultanov, 742 F. Supp. 3d 258, 266 (E.D.N.Y. 2024). This court is, of course, bound by Alasaad.

15

that a person living in Boston unlawfully entered the country several months prior and conduct a warrantless arrest of that person at their place of employment, the existence of probable cause to believe that the person illegally entered the country would not justify the warrantless search of a cell phone found on the arrestee's person at the time of the arrest. But if the authorities had probable cause to believe that the person illegally crossed the border less than an hour before apprehension— and could establish reasonable certainty that the arrestee had the cell phone when he crossed the border and that nothing of significance had changed regarding the cell phone since that time—Alasaad makes clear that a warrant would not be required to search that arrestee's phone under the border search exception.

Indeed, the facts of the lone case Rodriguez-Garcia points to supports this distinction. In Manrique-Frias, CBP agents encountered a Spanish-speaking man walking on a highway approximately nine miles south of the U.S.-Canada border. 692 F. Supp. 3d at 1042. He had a Mexican passport but no visa stamps. Id. When asked, the man stated he was in the U.S. illegally and claimed to be working for a nearby ranch. Id. at 1042-43. The agents arrested the man and later searched his cell phone, discovering child pornography. Id. at 1043.

The district court ruled that the search of the phone could not be justified by the extended border search doctrine—but not on the grounds that the officers lacked reasonable suspicion that a crime had been committed.[10] Id. at 1049-50. Rather, the

---

[10] Indeed, given the defendant's confession to being in the country illegally, it is hard to see how the officers would not have had reasonable suspicion.

16

district court held there was no reasonable certainty that the man had <u>recently</u> crossed the border. <u>Id.</u> They "had not questioned Manrique-Frias about his travel plans," "had not followed the tracks in the snow to trace from where Manrique-Frias had come," and "had not received any reports from Canadian authorities" that anyone had recently crossed the border. <u>Id.</u> at 1049. Therefore, there was no reasonable certainty that <u>the phone</u> had crossed the border, or that the defendant had crossed the border anytime in the recent past. For all the agents knew, the defendant could have entered the country years prior.

For all of these reasons, the court concludes that the search was lawful under the extended border search doctrine. Given this conclusion, the court need not address the government's arguments that the search was lawful because it was conducted at the physical border or that the good faith exception to the exclusionary rule applies.

## CONCLUSION

The motion to suppress (doc. no. 16) is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

June 26, 2025

cc:    Counsel of Record